Filed 5/16/23  In re Easton V. CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FIFTH APPELLATE DISTRICT**

| | |
|---|---|
| In re EASTON V. et al., Persons Coming Under the Juvenile Court Law. | |
| KINGS COUNTY HUMAN SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> M.V., <br><br> Defendant and Appellant. | F085320 <br><br> (Super. Ct. Nos. 21JD0040, 21JD0041) <br><br> **OPINION** |

<u>**THE COURT**</u>[*]

APPEAL from an order of the Superior Court of Kings County.  Jennifer Lee Giuliani, Judge.

Paul A. Swiller, under appointment by the Court of Appeal, for Defendant and Appellant.

Diane Freeman, County Counsel, and Risé A. Donlon and Thomas Y. Lin, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Detjen, Acting P. J., Peña, J. and Smith, J.

# INTRODUCTION

M.V. (mother) and C.C. (father) are the parents of sons Easton V. (born August 2015) and Ethan V. (born March 2020) (collectively, the children). Mother appeals from the juvenile court's order terminating her parental rights pursuant to Welfare and Institutions Code section 366.26.[1] She contends the juvenile court erred in declining to apply the parental-benefit exception to adoption. Additionally, she argues the Kings County Human Services Agency (agency) and the juvenile court failed to comply with the inquiry requirements of the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) (ICWA) and related California law because extended family members were not asked about the children's possible Indian ancestry.[2] The agency disagrees the juvenile court erred in declining to apply the parental-benefit exception, but concedes prejudicial error occurred as to ICWA.

For the reasons discussed herein, we accept the agency's concession of ICWA error. Consistent with our decisions in *In re K.H.* (2022) 84 Cal.App.5th 566 (*K.H.*) and *In re E.C.* (2022) 85 Cal.App.5th 123 (*E.C.*), we conclude "the error is prejudicial because neither the agency nor the court gathered information sufficient to ensure a reliable finding that ICWA does not apply and remanding for an adequate inquiry in the first instance is the only meaningful way to safeguard the rights at issue. ([*In re* ]*A.R.* [(2021)] 11 Cal.5th [234,] 252–254 [(*A.R.*)].) Accordingly, we conditionally reverse the juvenile court's finding that ICWA does not apply and remand for further proceedings consistent with this opinion, as set forth herein." (*K.H.*, at p. 591; accord, *E.C.*, at pp. 157–158.) In all other respects, we affirm.

---

[1]    All further statutory references are to the Welfare and Institutions Code.

[2]    "[B]ecause ICWA uses the term 'Indian,' we do the same for consistency, even though we recognize that other terms, such as 'Native American' or 'indigenous,' are preferred by many." (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 739, fn. 1.)

## FACTUAL AND PROCEDURAL BACKGROUND

### A.     Referral, Petition, and Detention

On March 28, 2021, the agency received a referral on behalf of the children after then one-year-old Ethan sustained burns to his face, neck, and torso.  Maternal aunt Angelica V. had taken the children to the hospital so Ethan could be examined.  Mother did not accompany them, but informed Angelica that Easton, then five years old, had poured shampoo over Ethan, causing the burns.  Medical staff confirmed it appeared the burns were caused by a substance being poured over Ethan's eyes, but it was unlikely to have been caused by hygiene products.  Both children were found to be underweight and Ethan was diagnosed as failure to thrive.  According to Easton, mother's boyfriend had poured soap on Ethan's eyes.  The children were detained.  Easton was placed with Angelica and Ethan remained hospitalized.

On March 30, 2021, the agency filed a petition on behalf of the children.  As to Ethan, the petition alleged pursuant to section 300, subdivision (b)(1) (failure to protect) and (g) (no provision for support), that mother failed to adequately supervise him as he suffered burns to his face, neck, and torso, and her explanation of the cause was inconsistent with the injuries.  As to Easton, the petition alleged pursuant to section 300, subdivisions (g) (no provision for support) and (j) (abuse of sibling), that he was at substantial risk of suffering similar abuse or neglect.  Father was incarcerated.  The agency subsequently amended the petition, adding one allegation for both children pursuant to section 300, subdivision (b)(1) (failure to protect), due to mother's substance abuse issues as she had tested positive for benzoylecgonine and cocaine.

On April 1, 2021, the juvenile court held a detention hearing and found a prima facie showing had been made that the children were described by section 300 and ordered them detained.  Mother was ordered to participate in supervised visits.

3.

**B.     Jurisdiction and Disposition**

The jurisdiction and disposition report stated the children were both placed with Angelica. Mother was participating in supervised visitation. The agency supervised five visits. At the beginning of mother and Easton's first visit, Easton began crying happy tears and ran to her when he saw her. Overall, the children were happy and excited during visits. Mother was appropriate, attentive, and affectionate. They played together and ate. Mother's visits quickly progressed to third party supervised visits, with Angelica as the supervising party.

On July 29, 2021, the juvenile court held a combined jurisdiction and disposition hearing where it found the allegations in the first amended petition true. The disposition hearing was continued.

On August 10, 2021, the juvenile court held a continued disposition hearing and ordered mother to participate in reunification services.

**C.     Six-Month Status Review**

The six-month status review report stated the children were now placed with a nonrelative care provider who was previously married to a maternal uncle and had a preexisting relationship with the children. This individual was later identified as maternal great-aunt Kirstyn.[3] The children had transitioned well into their new placement. Mother had been participating in services and secured stable housing. She finished a parenting class and continued to submit to hair follicle tests, which were still positive for cocaine with decreasing levels. Overall, she had been in compliance with all components of her case plan. Additionally, she had been consistently participating in visits, which were now being supervised by the agency again. Mother and Angelica had a falling out, and Angelica reported she no longer wanted to supervise the visits. She said mother was being " 'toxic and disrespectful.' " Their dispute arose because Angelica felt

---

[3]     She was also referred to as "auntie Kristen."

4.

she could no longer keep the children. The agency described the visits as "supportive and meaningful." The agency recommended that mother continue participating in reunification services.

On February 8, 2022, the juvenile court held a six-month review hearing and continued mother's reunification services.

**D.      Twelve-Month Status Review**

The 12-month status review report indicated the children were still in placement with Kirstyn, who was willing to provide the children with a permanent plan of adoption or guardianship. Although mother had previously been doing well, during this review period she had been arrested for driving under the influence and resisting arrest. The agency reported she had not demonstrated a behavioral change during the review period and was unable to utilize the skills she had learned through her services. Visits again progressed to third party visits, supervised by Kirstyn. Kirstyn expressed concerns about the visits, reporting mother spoke to the children harshly, made inappropriate comments during one visit like calling someone a " 'crack head,' " and was on the phone too much. On one occasion, she snapped at Ethan, telling him, " '[H]urry the f*** up and come on and stop crying.' " When Easton attempted to stop Ethan from running in the street, mother yelled, " '[W]hat is your f***ing problem, mind your own business.' " Thereafter, visits went back to being supervised by the agency who also reported mother was on the phone too much during visits and spoke harshly to the children. Due to mother's behavior, Kirstyn no longer wished to engage with her. The agency reported mother had been unable to demonstrate patience with the children, or other adults. She continued to struggle with self-regulation and the children would " 'shut down' " when mother became angry. The agency recommended terminating mother's reunification services.

On May 26, 2022, the juvenile court held a 12-month review hearing. The court terminated mother's reunification services and set a section 366.26 hearing.

**E.    Section 366.26**

The section 366.26 report stated the children were still in placement with Kirstyn. Mother was still participating consistently in visitation and had only missed two visits in 2022.  The agency had been supervising visits.  The children and mother appeared happy to see each other, enjoyed their time together, and the children transitioned in and out of visits well.  Kirstyn supervised one visit on Easton's birthday, which went "very well."

The children were considered adoptable, and Kirstyn was committed to adopting them.  Easton stated that if he could not live with mother, he would want to live with Kirstyn.  Ethan consistently appeared comfortable and happy with her.  A social worker met with Easton and completed an activity in which he had to place activities and people in pretend houses.  He stated he would place Ethan, Kirstyn, "KK," father, and mother in his "House of Good Things."  He said mother belonged there because "we love her and do fun things with her."  No one belonged in his "House of Worries" or the "House of Dreams."  The agency recommended terminating parental rights with a permanent plan of adoption.

On September 20, 2022, mother testified at the section 366.26 hearing.  When asked why the children should not be adopted, she said she felt like they needed "their parents."  She said she had "a good bond and connection" with them.  She added that it was going to mentally and physically "mess them up" because they were used to being with her.  They always asked when they would be going back home and did not like to be with other people.  She said, "I just don't think that it's right what's going on.  I think I should get another opportunity.  I did all the classes.  I've drug tested.  I did everything that the [c]ourt has asked me to do and it just wasn't good enough for you guys.  I shouldn't be able to never see my kids again until they are 18 or older and, then, have remorse against me and not like me or hate me as a person because of a situation that happened that it wasn't even my fault."  Mother described her visits with the children as "good."  The children were always happy.  They played and talked, and sometimes did

not want to leave. They called her "mom." When they arrived at visits, they would run to mother's car and hug her. When it was time to leave, they would give her a hug and tell her goodbye.

The assigned social worker testified she assessed the detriment the children would suffer if parental rights were terminated and believed there was no indication they would suffer detriment. Ethan, who was two, was too young to articulate his feelings. The social worker discussed adoption with Easton, explaining he might not see his parents again while he is a child. In response, Easton stated that "he misses mommy and that he would be sad not to see mommy or daddy, but that he would be happy because he would get to stay with auntie [Kirstyn]." She opined that it would not be detrimental to Easton to terminate parental rights because he was "adapting to the time that [he was] not seeing his parents. He [was] becoming more stable out of their home.… [He was] developing like a normal[,] regular[,] happy little kid.…" When they spoke about mother and father, he would say he was sad but there was not a "dramatic expression of emotion."

The juvenile court found the children were adoptable and that the parental-benefit exception did not apply. In ruling, the juvenile court explained the applicable law and then addressed each prong of the exception as follows:

> "As indicated by [county counsel] and [mother's counsel], the first prong of the three-prong test, … is that there has been regular visitation and contact. I don't believe that it was disputed by anybody that there has not been regular visitation and contact between the parents and the children.… [I]t does appear that there has been contact with both parents. So, certainly, the visitation prong seems to have been met by the parents.

> "The next prong is that the [c]ourt must find a relationship between the parents and the children, the continuation of which would benefit the child. I don't believe there's any[ ]way that, especially with regard to Easton, that the [c]ourt cannot find that there is a relationship between the parents and Easton. It looks like Easton is now seven. He was out of his mother's care for about a year, from 2018 to 2019, while she participated in family reunification services. It looks like the children have been out of

7.

care for about a year-and-a-half now.  With regard to [Ethan] it looks like [Ethan] was about a year old when he was removed from [mother] and it's been about a year-and-a-half that he's been out of [her] care.  I believe I can certainly find that there is a relationship between the parents and the children.

"With regard to Easton, it is arguable, although I don't have any solid evidence—it's speculation—that Easton certainly would benefit from continuing that relation[ship].  I agree with [mother's counsel].  It is sort of speculative [of] the effect with regard to Ethan as he has been out of care of both of his parents for longer than he was ever in their care.

"The last prong, which always is the most difficult prong, is that the [c]ourt must find that termination of the relationship between the parents and the children would be detrimental to the child.  And every parent who testifies at these kinds of hearings says the exact same thing.  They say my children or our children need to be with their parents.  And I don't have any doubt that every parent who testifies believes that that is the truth.  What the parents don't have that the attorneys have what I have [is] the knowledge, I suppose, of reading all of the cases that come down from the appellate courts and the Supreme Court that deals with what does detriment mean.  So there are a bunch of cases out there that really talk about what that has—what do parents have to prove when they are talking about detriment and it being detrimental to the child.  And those cases are pretty clear that that detriment has to be shown.  Not just I think it would be bad.  I think that it would be hard for them.  I think that wouldn't be right for them.  That's not enough as far as the cases go to support the position that it would be detrimental to the kids.  It's not enough, according to the cases, that a child says it's going to make me sad if I don't see my parents.  [The social worker] testified today that she talked to Easton and explained that he may not see his parents again until he is a grown-up, until he's older, and he said it made him sad, but making him sad doesn't meet the requirements of detriment, according to the law.  And I know it feels like for every parent who testifies that … it should be a no-brainer that removing or terminating parental rights would be detrimental to a child and that's not supported by the cases that have come out of the appellate courts that have considered that issue.

"The [c]ourt finds that the parental benefit exception, the parents have not carried their burden with regard to meeting that exception.…"

Accordingly, the juvenile court terminated parental rights and ordered a permanent plan of adoption.

8.

On October 20, 2022, mother filed a notice of appeal.

## DISCUSSION

## I.    **Parental-Benefit Exception**

Mother contends the juvenile court erred in declining to apply the parental-benefit exception because termination of the relationship was detrimental to the children.

### A.    **Legal Principles**

"If the court cannot safely return a dependent child to a parent's custody within statutory time limits, the court must set a hearing under section 366.26." (*In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C.*).) "[T]he goal at the section 366.26 hearing is 'specifically … to select and implement a permanent plan for the child.' " (*Ibid*.) "At [the] hearing, the court may order one of three alternatives:  adoption, guardianship or long-term foster care." (*In re S.B.* (2008) 164 Cal.App.4th 289, 296.) "According to [the] procedure [under section 366.26], the court must first determine by clear and convincing evidence whether the child is likely to be adopted.  [Citation.]  If so, and if the court finds that there has been a previous determination that reunification services be terminated, then the court shall terminate parental rights to allow for adoption.  [Citation.] But if the parent shows that termination would be detrimental to the child for at least one specifically enumerated reason, the court should decline to terminate parental rights and select another permanent plan." (*Caden C.*, at pp. 630–631.)  One exception to adoption is the parental-benefit exception, which requires the parent to establish, by a preponderance of the evidence, "that the parent has regularly visited with the child, that the child would benefit from continuing the relationship, and that terminating the relationship would be detrimental to the child." (*Id*. at p. 629; § 366.26, subd. (c)(1)(B)(i).)

"The first element—regular visitation and contact—is straightforward.  The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.'  [Citation.]  Visits and contact 'continue[] or develop[] a

significant, positive, emotional attachment from child to parent.' [Citation.] Courts should consider in that light whether parents 'maintained regular visitation and contact with the child' (§ 366.26, subd. (c)(1)(B)(i)) but certainly not to punish parents or reward them for good behavior in visiting or maintaining contact—here, as throughout, the focus is on the best interests of the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)

"As to the second element, courts assess whether 'the child would benefit from continuing the relationship.' (§ 366.26, subd. (c)(1)(B)(i).) Again here, the focus is the child. And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) "[C]ourts often consider how children feel about, interact with, look to, or talk about their parents. [Citations.] Doing so properly focuses the inquiry on the child …." (*Ibid.*)

"Concerning the third element—whether 'termination would be detrimental to the child due to' the relationship—the court must decide whether it would be harmful to the child to sever the relationship and choose adoption." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) The court must determine "how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Ibid.*) "[T]he effects [on the child] might include emotional instability and preoccupation leading to acting out, difficulties in school, insomnia, anxiety, or depression. Yet … a new, stable home may alleviate the emotional instability and preoccupation leading to such problems, providing a new source of stability that could make the loss of a parent not, at least on balance, detrimental." (*Ibid.*) "When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent." (*Id.* at pp. 633–634.) "When it weighs whether termination would be detrimental, the court is not comparing

the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s)." (*Id.* at p. 634.) "[T]he section 366.26 hearing is decidedly not a contest of who would be the better custodial caregiver." (*Ibid.*)

## B. Standard of Review

The first two elements are reviewed for substantial evidence. (*Caden C.*, *supra*, 11 Cal.5th at p. 639.) "In reviewing factual determinations for substantial evidence, a reviewing court should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' [Citation.] The determinations should 'be upheld if … supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.' " (*Id.* at p. 640.)

"The third element … is somewhat different." (*Caden C.*, *supra*, 11 Cal.5th at p. 640.) "As in assessing visitation and the relationship between parent and child, the court must make a series of factual determinations. These may range from the specific features of the child's relationship with the parent and the harm that would come from losing those specific features to a higher-level conclusion of how harmful in total that loss would be. The court must also determine, for the particular child, how a prospective adoptive placement may offset and even counterbalance those harms. In so doing, it may make explicit or implicit findings ranging from specific benefits related to the child's specific characteristics up to a higher-level conclusion about the benefit of adoption all told. All these factual determinations are properly reviewed for substantial evidence." (*Ibid.*) "Yet the court must also engage in a delicate balancing of these determinations as part of assessing the likely course of a future situation that's inherently uncertain." (*Ibid.*) It requires "assessing what the child's life would be like in an adoptive home without the parent in his life." (*Ibid.*) "The court makes the assessment by weighing the harm of losing the relationship against the benefits of placement in a new, adoptive home. And so, the ultimate decision—whether termination of parental rights would be

detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion." (*Ibid.*)

A court abuses its discretion only when it " 'has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " (*In re Geoffrey G.* (1979) 98 Cal.App.3d 412, 421.) "When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." (*Shamblin v. Brattain* (1988) 44 Cal.3d 474, 478–479.)

### C.    Analysis

In order to establish the parental-benefit exception, mother was required to show, by a preponderance of the evidence, that (1) she regularly visited the children, (2) the children would benefit from continuing the relationship, and (3) terminating the relationship would be detrimental to the children. (*Caden C.*, *supra*, 11 Cal.5th at p. 629; § 366.26, subd. (c)(1)(B)(i).) The juvenile court found mother had satisfied the first two prongs.[4] Thus, the only remaining issue is whether she satisfied her burden under the third prong.

As noted, when it comes to the third element, "the court must decide whether it would be harmful to the child to sever the relationship and chose adoption." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) "[T]he parent must show that terminating [the relationship] would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Id.* at p. 636.) Here, the juvenile court acted within its

---

[4]    Mother argues the juvenile court should have found the second prong satisfied, but the court did indeed make such a finding. It stated, "The next prong is that the [c]ourt must find a relationship between the parents and the children, the continuation of which would benefit the child. I don't believe there's any[ ]way that, especially with regard to Easton, that the [c]ourt cannot find that there is a relationship between the parents and Easton.… I believe I can certainly find that there is a relationship between the parents and the children."

discretion in finding that severing the relationship would not be detrimental to the children. Although the evidence showed the children had a beneficial relationship with mother, there was no indication the children would suffer detriment from severing the relationship within the meaning of the exception. The social worker testified she explained what adoption meant to Easton. She told him it meant he might not see his parents while he is a child. Easton stated it would make him sad not to see mother, but that he would be happy because he would be staying with Kirstyn. Ethan was too young to provide a statement, but he had spent 18 months out of mother's care, which was a majority of his life. Additionally, the social worker testified Easton was adapting to not seeing mother and was becoming more stable out of her care. When he spoke about mother and father, he expressed sadness, but there was no "dramatic expression of emotion." When asked whether he wanted to live with Kirstyn forever and "for her to be his mom," Easton had "a big smile on his face, and he nodded yes." Indeed, mother testified the children had no problem separating from her at the end of visits—they would simply hug her and tell her goodbye. As the court noted, "making [Easton] sad doesn't meet the requirements of detriment, according to the law."

In light of these circumstances, we cannot conclude the juvenile court abused its discretion in finding that the benefit of a stable home outweighed any detriment the children would suffer as a result of severing the relationship.

## II. ICWA

Mother next contends the juvenile court and the agency failed to comply with the inquiry requirements of ICWA and related state law because extended family members were not asked about the children's possible Indian ancestry.

### A. Additional Background

Prior to the petition being filed, mother denied having Indian ancestry. Father was incarcerated and the agency had been unable to inquire of him. However, in a prior dependency case involving Easton, the juvenile court had found ICWA did not apply.

13.

When the agency filed the petition in the current case, it attached an Indian Child Inquiry Attachment (ICWA-010(A)) form stating the agency conducted inquiries with mother and father and they gave no reason to believe the children could be Indian children.

On April 1, 2021, mother filed a Parental Notification of Indian Status (ICWA-020) form denying Indian ancestry. At the detention hearing that same day, an inquiry was conducted with mother, and she again denied having Indian ancestry. The juvenile court found ICWA did not apply.

On April 28, 2021, father filed an ICWA-020 form denying Indian ancestry.

On July 29, 2021, father filed another ICWA-020 form denying Indian ancestry. That same day at a continued jurisdiction and disposition hearing, the juvenile court acknowledged receipt of father's ICWA-020 form. The agency conducted an inquiry with father in court. Father testified he did not have Indian ancestry.

The jurisdiction and disposition report, the six-month status review report, and the 12-month status review report stated ICWA did not apply.

The section 366.26 report stated no additional information had been provided by the parents to suggest the children were or could be Indian children and, therefore, a new inquiry was not necessary. The agency recommended the juvenile court reiterate its previous findings that ICWA did not apply.

On September 20, 2022, at the section 366.26 hearing, the juvenile court signed and filed a "FINDING REGARDING ICWA INQUIRY IN ACCORDANCE WITH [CALIFORNIA RULES OF COURT,] RULE 5.481(a)," stating that an inquiry had been completed and ICWA did not apply.[5]

### B.  Legal Principles

" 'ICWA is a federal law giving Indian tribes concurrent jurisdiction over state court child custody proceedings that involve Indian children living off of a reservation'

---

[5]  All further references to rules are to the California Rules of Court.

[citations], in furtherance of 'federal policy " 'that, where possible, an Indian child should remain in the Indian community' " ' [citations]. 'ICWA establishes minimum federal standards, both procedural and substantive, governing the removal of Indian children from their families' [citations], and '[w]hen ICWA applies, the Indian tribe has a right to intervene in or exercise jurisdiction over the proceeding.' " (*K.H.*, *supra*, 84 Cal.App.5th at p. 594, fn. omitted; accord, *E.C.*, *supra*, 85 Cal.App.5th at p. 138, fn. omitted.)

" 'In 2006, California adopted various procedural and substantive provisions of ICWA.' [Citations.] The Legislature's 'primary objective … was to *increase* compliance with ICWA. California Indian Legal Services (CILS), a proponent of the bill, observed that courts and county agencies still had difficulty complying with ICWA 25 years after its enactment, and CILS believed codification of [ICWA's] requirements into state law would help alleviate the problem.' " (*K.H.*, *supra*, 84 Cal.App.5th at p. 595; accord, *E.C.*, *supra*, 85 Cal.App.5th at pp. 138–139.)

" 'In 2016, new federal regulations were adopted concerning ICWA compliance. [Citation.] Following the enactment of the federal regulations, California made conforming amendments to its statutes, including portions of the Welfare and Institutions Code related to ICWA notice and inquiry requirements. [Citations.] Those changes became effective January 1, 2019 .…' [Citation.] Subsequently, the Legislature amended section 224.2, subdivision (e), to define 'reason to believe,' effective September 18, 2020." (*K.H.*, *supra*, 84 Cal.App.5th at pp. 595–596, fn. omitted; accord, *E.C.*, *supra*, 85 Cal.App.5th at p. 139.)

### 1. Summary of Duties of Inquiry and Notice

"[W]hether a child is a member, or is eligible for membership, in a particular tribe is a determination that rests exclusively with the tribe, and neither the agency nor the court plays any role in making that determination. [Citations.] ' "Because it typically is not self-evident whether a child is an Indian child, both federal and state law mandate

certain inquiries to be made in each case." ' " (*K.H.*, *supra*, 84 Cal.App.5th at p. 596; accord, *E.C.*, *supra*, 85 Cal.App.5th at pp. 139–140.)

"In California, section 224.2 'codifies and elaborates on ICWA's requirements of notice to a child's parents or legal guardian, Indian custodian, and Indian tribe, and to the [Bureau of Indian Affairs].' " (*In re A.R.* (2022) 77 Cal.App.5th 197, 204.) California law imposes "an affirmative and continuing duty [on the court and the county welfare agency to inquire whether a child for whom a petition under [s]ection 300, … may be or has been filed, is or may be an Indian child." (§ 224.2, subd. (a).)

"The [state law] duty to inquire begins with the initial contact, including, but not limited to, asking the party reporting child abuse or neglect whether the party has any information that the child may be an Indian child." (§ 224.2, subd. (a).) "If a child is placed into the temporary custody of a county welfare [agency] pursuant to [s]ection 306 … the county welfare [agency] … has a duty to inquire whether that child is an Indian child. Inquiry includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled." (§ 224.2, subd. (b).) Additionally, "[a]t the first appearance in court of each party, the court shall ask each participant present in the hearing whether the participant knows or has reason to know that the child is an Indian child. The court shall instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child." (§ 224.2, subd. (c).)

"If the initial inquiry provides 'reason to believe' that an Indian child is involved in a proceeding—that is, if the court or social worker 'has information suggesting that either the parent of the child or the child is a member or may be eligible for membership in an Indian tribe'—then the court or social worker 'shall make further inquiry' regarding the child's possible Indian status as soon as practicable." (*In re Ezequiel G.* (2022) 81

16.

Cal.App.5th 984, 999 (*Ezequiel G.*), citing § 224.2, subd. (e).) "Further inquiry 'includes, but is not limited to, all of the following: [¶] (A) Interviewing the parents, Indian custodian, and extended family members[;] [¶] (B) Contacting the Bureau of Indian Affairs and the State Department of Social Services[; and] [¶] (C) Contacting the tribe or tribes and any other person that may reasonably be expected to have information regarding the child's membership, citizenship status, or eligibility.' " (*Ezequiel G.*, at p. 999.)

"If there is 'reason to know' a child is an Indian child, the agency shall provide notice to the relevant tribes and agencies in accordance with section 224.3, subdivision (a)(5)." (*Ezequiel G.*, *supra*, 81 Cal.App.5th at p. 999, citing § 224.2, subd. (f).) "There is 'reason to know' a child is an Indian child if any one of six statutory criteria is met—i.e., if the court is advised that the child 'is an Indian child,' the child's or parent's residence is on a reservation, the child is or has been a ward of a tribal court, or either parent or the child possess an identification card indicating membership or citizenship in an Indian tribe." (*Ezequiel G.*, at p. 999, citing § 224.2, subd. (d).)

County welfare departments "must on an ongoing basis include in its filings a detailed description of all inquiries, and further inquiries it has undertaken, and all information received pertaining to the child's Indian status, as well as evidence of how and when this information was provided to the relevant tribes. Whenever new information is received, that information must be expeditiously provided to the tribes." (Rule 5.481(a)(5).)

### C. Analysis

#### 1. Summary of ICWA Inquiry and Notice

In the present case, mother filed an ICWA-020 form denying Indian ancestry. The disposition report stated father was incarcerated and had not been interviewed, but ICWA was found not to apply in Easton's prior dependency case. At the disposition hearing, an inquiry was conducted of mother where she again denied having Indian ancestry, and the

17.

juvenile court found ICWA did not apply. Before the jurisdiction and disposition hearing, father completed two ICWA-020 forms denying Indian ancestry. Father's first appearance was at a jurisdiction and disposition hearing. An ICWA inquiry was conducted in court at that time, and he again denied having Indian ancestry. At the section 366.26 hearing, the court reiterated that ICWA did not apply.

The record shows the agency was in contact with several extended family members. Initially, the children were placed with maternal aunt Angelica. A few months later, the children were moved to placement with maternal great-aunt Kirstyn. Maternal grandmother, maternal great-grandmother, and maternal great-great-grandmother all participated in visits. Additionally, father provided information for the paternal grandparents and paternal uncles. There is no indication the agency asked these relatives about the children's possible Indian ancestry. Mother contends the agency's failure to conduct inquires with the extended family members resulted in prejudicial error. The agency concedes.

In *K.H.* and *E.C.*, we addressed ICWA error at the inquiry stage. There, we explained our decision not to follow the approaches articulated by other appellate courts for determining whether ICWA error requires reversal and concluded that the Supreme Court's decision in *A.R.* supplies the appropriate framework for assessing prejudice in this context. (*K.H.*, *supra*, 84 Cal.App.5th at pp. 607–608, citing *A.R.*, *supra*, 11 Cal.5th at pp. 252–254; accord, *E.C.*, *supra*, 85 Cal.App.5th at p. 152.) Applying the standards we articulated in *K.H.* and *E.C.*, as we will discuss below, we agree with the parties and conclude the agency's error is prejudicial and remand for the agency to conduct a proper, adequate, and duly diligent inquiry is necessary.

### 2. Standard of Review

"The juvenile court's finding that ICWA does not apply to the proceeding rests on two elemental determinations, 'subject to reversal based on sufficiency of the evidence.' " (*K.H.*, *supra*, 84 Cal.App.5th at p. 601, quoting § 224.2, subd. (i)(2); accord,

*E.C.*, *supra*, 85 Cal.App.5th at pp. 142–143.)  First, "[t]he court must find there is 'no reason to know whether the child is an Indian child,' which is dependent upon whether any of the six circumstances set forth in subdivision (d) of section 224.2 apply."  (*K.H.*, at p. 601, quoting § 224.2, subd. (i)(2); accord, *E.C.*, at p. 143.)  Second, "[t]he juvenile court must … find a 'proper and adequate further inquiry and due diligence .…' " (*K.H.*, at p. 601, quoting § 224.2, subd. (i)(2); accord, *E.C.*, at p. 143.)

Under the substantial evidence standard, " 'a reviewing court should "not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts." [Citation.]  The determinations should "be upheld if … supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence." ' [Citations.]  The standard recognizes that '[t]rial courts "generally are in a better position to evaluate and weigh the evidence" than appellate courts' [citation], and 'an appellate court should accept a trial court's factual findings if they are reasonable and supported by substantial evidence in the record' [citation].  '[I]f a court holds an evidentiary hearing, it may make credibility determinations, to which an appellate court would generally defer.' " (*K.H.*, *supra*, 84 Cal.App.5th at p. 601; accord, *E.C.*, *supra*, 85 Cal.App.5th at p. 143.)

The juvenile court's finding on the second element, however, "is ultimately discretionary because it requires the juvenile court to 'engage in a delicate balancing of' various factors in assessing whether the agency's inquiry was proper and adequate within the context of ICWA and California law, and whether the agency acted with due diligence." (*K.H.*, *supra*, 84 Cal.App.5th at p. 601, quoting *Caden C.*, *supra*, 11 Cal.5th at p. 640; accord, *E.C.*, *supra*, 85 Cal.App.5th at p. 143; *Ezequiel G.*, *supra*, 81 Cal.App.5th at pp. 1004–1005.)  Therefore, we employ a hybrid standard and review the court's determination for substantial evidence and abuse of discretion.  (*K.H.*, at p. 601; accord, *E.C.*, at pp. 143–144; *Ezequiel G.*, at pp. 1004–1005.)

" 'Review for abuse of discretion is subtly different [from review for substantial evidence], focused not primarily on the evidence but the application of a legal standard. A court abuses its discretion only when " ' "the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination." ' " [Citation.]  But " ' "[w]hen two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court[.]" ' "  [Citations.]  [¶]  While each standard here fits a distinct type of determination under review, the practical difference between the standards is not likely to be very pronounced.' " (*K.H.*, *supra*, 84 Cal.App.5th at p. 602; accord, *E.C.*, *supra*, 85 Cal.App.5th at pp. 143–144.)

"Review of the juvenile court's findings under the foregoing standards is deferential, but ' "an appellate court [nevertheless] exercises its independent judgment to determine whether the facts satisfy the rule of law." '  [Citations.]  Where the material facts are undisputed, courts have applied independent review to determine whether ICWA's requirements were satisfied." (*K.H.*, *supra*, 84 Cal.App.5th at p. 602; accord, *E.C.*, *supra*, 85 Cal.App.5th at p. 144.)

### 3.    Agency and Juvenile Court Erred

As previously mentioned, when "a child is placed into the temporary custody of a county welfare [agency] …, the county welfare [agency] … has a duty to inquire whether [the] child is an Indian child.  Inquiry includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled." (§ 224.2, subd. (b).)  Extended family members include adult grandparents, siblings, brothers- or sisters-in-law, aunts, uncles, nieces, nephews, and first or second cousins.  (25 U.S.C. § 1903(2); § 224.1, subd. (c).)

Here, the agency inquired only of mother and father, which fell short of complying with the plain language of section 224.2, subdivision (b), which required the agency to inquire of extended family members. "[T]he law demands more than merely inquiring of [m]other and [f]ather" (*K.H.*, *supra*, 84 Cal.App.5th at p. 620, citing *In re Antonio R.* (2022) 76 Cal.App.5th 421, 431; accord, *In re M.M.* (2022) 81 Cal.App.5th 61, 74, review granted Oct. 12, 2022, S276099 (dis. opn. of Wiley, J.)), a point the agency does not dispute. There may be cases in which there is no one else to ask, but if that is so, the record must be developed to reflect that fact and supported by documentation. (Rule 5.481(a)(5).) "On a well-developed record, the court has relatively broad discretion [in such cases] to determine [that] the agency's inquiry was proper, adequate, and duly diligent on the specific facts of the case." (*K.H.*, at p. 589; accord, *E.C.*, *supra*, 85 Cal.App.5th at p. 157.) Accordingly, the juvenile court's finding that ICWA did not apply was not supported by substantial evidence, and its contrary conclusion was an abuse of discretion. (§ 224.2, subd. (i)(2).)

### 4.      Prejudice

"Where, as here, the deficiency lies with the agency's duty of […] inquiry and a juvenile court's related finding of 'proper and adequate further inquiry and due diligence' (§ 224.2, subd. (i)(2)), the error is one of state law ([*In re*] *Benjamin M.*, *supra*, 70 Cal.App.5th at p. 742). Under the California Constitution, '[n]o judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' (Cal. Const., art. VI, § 13.)" (*K.H.*, *supra*, 84 Cal.App.5th at p. 606; accord, *E.C.*, *supra*, 85 Cal.App.5th at p. 151.)

" '[T]o be entitled to relief on appeal from an alleged abuse of discretion, it must clearly appear the resulting injury is sufficiently grave to manifest a miscarriage of

21.

justice' [citations], and California law generally interprets its constitutional miscarriage of justice requirement 'as permitting reversal only if the reviewing court finds it reasonably probable the result would have been more favorable to the appealing party but for the error.' " (*K.H.*, *supra*, 84 Cal.App.5th at pp. 606–607; accord, *E.C.*, *supra*, 85 Cal.App.5th at pp. 151–152.)

However, in *A.R.*, the Supreme Court "recognized that while we generally apply a *Watson*[6] likelihood-of-success test to assess prejudice, a merits-based outcome-focused test is not always appropriate because it cannot always adequately measure the relevant harm. [Citation.] In other words, where the injury caused by the error is unrelated to an outcome on the merits, tethering the showing of prejudice to such an outcome misplaces the measure, at the expense of the rights the law in question was designed to protect." (*K.H.*, *supra*, 84 Cal.App.5th at p. 609, italics omitted.)

As we explained in *K.H.*, " 'ICWA compliance presents a unique situation ….' " (*K.H.*, *supra*, 84 Cal.App.5th at p. 608.) "ICWA is not directed at reaching, or protecting, a specific outcome on the merits." (*Id*. at p. 609; accord, *E.C.*, *supra*, 85 Cal.App.5th at p. 154.) Rather, " '[t]he purpose of ICWA and related California statutes is to provide notice to the tribe sufficient to allow it to determine whether the child is an Indian child, and whether the tribe wishes to intervene in the proceedings' [citation], and an adequate initial inquiry facilitates the information gathering upon which the court's ICWA determination will rest." (*K.H.*, at p. 608; accord, *E.C.*, at pp. 152–153.) Yet, "while the appealing party is usually a parent, parents do not bear the burden of gathering information in compliance with ICWA [citations], and parents may raise the claim of error for the first time on appeal." (*K.H.*, at p. 608; accord, *E.C.*, at p. 153.) Further, the ultimate determination whether a child is an Indian child rests with the tribe, not with a parent, the agency, or the juvenile court. (*K.H.*, at p. 590; accord, *E.C.*, at pp. 139–140.)

---

**6**     *People v. Watson* (1956) 46 Cal.2d 818, 836.

"[W]here the opportunity to gather the relevant information critical to determining whether the child is or may be an Indian child is lost because there has not been adequate inquiry and due diligence, reversal for correction is generally the only effective safeguard." (*K.H.*, at p. 610, citing *A.R.*, *supra*, 11 Cal.5th at pp. 252–254; accord, *E.C.*, at p. 155.)

Here, the agency's inquiry, limited only to mother and father, " 'fell well short of that required to gather the information needed to meaningfully safeguard the rights of the tribes, as intended under ICWA and California law' " (*E.C.*, *supra*, 85 Cal.App.5th at p. 156, quoting *K.H.*, *supra*, 84 Cal.App.5th at p. 620), and "[a] finding of harmlessness on this record would necessarily require speculation and 'is at odds with the statutory protections that ICWA and California law intend to afford Indian children and Indian tribes.' " (*E.C.*, at p. 155, quoting *K.H.*, at p. 611.) Therefore, the error is prejudicial and reversal is required.

Accordingly, the juvenile court's finding that ICWA does not apply is conditionally reversed and the matter is remanded. The juvenile court is instructed to ensure the agency conducts " 'a proper, adequate, and duly diligent inquiry under section 224.2, subdivision[s] (b) [and (e)], and document its inquiry in the record in compliance with rule 5.481(a)(5).' " (*E.C.*, *supra*, 85 Cal.App.5th at p. 157, quoting *K.H.*, *supra*, 84 Cal.App.5th at p. 621.) " 'This should not be interpreted as requiring an exhaustive search for and questioning of every living relative of [the children]' but '[w]e leave that determination for the juvenile court in the first instance because it is better positioned to evaluate the evidence provided by the [agency]. So long as the court ensures the inquiry is reasonable and of sufficient reach to accomplish the legislative purpose underlying ICWA and related California law, the court will have an adequate factual foundation upon which to make its ICWA finding. (§ 224.2, subd. (i)(2).)' " (*E.C.*, *supra*, 85 Cal.App.5th at p. 157, quoting *K.H.*, *supra*, 84 Cal.App.5th at p. 621.)

**DISPOSITION**

The juvenile court's finding that ICWA does not apply is conditionally reversed, and the matter is remanded to the juvenile court with directions to order the agency to comply with the inquiry and documentation provisions set forth in section 224.2, subdivisions (b) and (e), and rule 5.481(a)(5). The juvenile court is directed to comply with inquiry provisions of section 224.2, subdivision (c). If, after determining that an adequate inquiry was made consistent with the reasoning in this opinion, the court finds that ICWA applies, the court shall vacate its existing order and proceed in compliance with ICWA and related California law. If the court instead finds that ICWA does not apply, its ICWA finding shall be reinstated. In all other respects, the juvenile court's order is affirmed.